**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| DWIGHT MOSLEY | |
| Appellant | No. 501 EDA 2016 |

Appeal from the Judgment of Sentence December 22, 2015
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0002045-2015

BEFORE:  BOWES, J., MOULTON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY MOULTON, J.:                    **FILED JANUARY 23, 2017**

Dwight Mosley appeals from the December 22, 2015 judgment of sentence entered in the Delaware County Court of Common Pleas following his jury trial convictions for robbery, aggravated assault, possession of a firearm prohibited, possession of a controlled substance, and possession of drug paraphernalia.[1]  We affirm.

This case arose out of the December 8, 2014 robbery of Reginald Glascoe.  Mosley was arrested on the night of, and near the scene of, the robbery.  He filed an omnibus pre-trial motion seeking to suppress the

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 3701(a)(1), 2702(a)(4), and 6105(a)(1), and 35 P.S. 780-113(a)(16) and 780-113(a)(32), respectively.  The jury found Mosley not guilty of attempted homicide, 18 Pa.C.S. § 901.

evidence seized and statements made, arguing they were the result of an illegal detention. Mosley further argued that the trial court should have suppressed Glascoe's out-of-court and in-court identifications.

After a suppression hearing, the trial court found the following facts relating to Mosley's illegal detention claim:

1. Officer Ricci Pyle is employed with the Chester City Police Department and has been so employed since March of 2014. Prior to his employment with Chester Police Department, Officer Pyle spent 10 years as a police officer with Marcus Hook Police Department.

2. On December 8, 2014, Officer Pyle was working in his capacity as a patrolman, in full uniform. At approximately 12:30a.m., Officer Pyle observed a male at 23rd and Madison. The male was frantically running down the street.

3. Officer Pyle stopped the male to see what was going on. The male stated that he was just robbed at gunpoint. The robber demanded that he give him money. The robber kept demanding that the victim give him more money despite the victim telling him it was all he had. The robber then pointed the gun at [the victim's] feet and pulled the trigger three times but the gun did not fire and the victim ran away.

4. Officer Pyle transported the victim to his home around the corner. The victim stated that the robber was a black male in a black hoodie and that he got a good look at his attacker and would be able to identify him.

5. Officer Pyle headed back towards 23rd street and observed two subjects walking towards him, one being a white female. Officer Pyle circled around the block. When Officer Pyle was approximately a house away from where the robbery occurred, he again observed the female except she was now walking alone.

6. Officer Pyle exited his vehicle, without initiating any lights or sirens, merely to speak with the woman.

7. As Officer Pyle was crossing the street towards the woman, a black male appeared. Officer Pyle asked the male where he went from the time he first saw them until now. The male, later identified as [Mosley], stated that he was urinating in someone's backyard. [Mosley] told Officer Pyle that he didn't want to pee on the sidewalk.

8. Officer Pyle decided he was going to arrest [Mosley] for disorderly conduct. [Mosley] verbally provided his information to Officer Pyle.

9. Prior to placing [Mosley] in cuffs, Officer Pyle asked [Mosley] if he had anything on his person that he should be aware of, to which [Mosley] responded that he had a gun.

10. Officer Pyle asked [Mosley] where the gun was located on his person; [Mosley] replied that it was in his pocket. Officer Pyle retrieved the weapon.

11. At this point, with [Mosley] matching the description, having a firearm on his person, and being in close vicinity to the scene of the robbery, Officer Pyle contacted the victim and asked if he could come down for a possible identification.

12. Officer Pyle placed [Mosley] in the back of his patrol vehicle.

13. As Officer Pyle observed another patrol vehicle bringing the victim towards the scene, Officer Pyle removed [Mosley] from his patrol vehicle and placed [Mosley] towards the end of the car.

14. The victim stayed in the other police vehicle approximately twenty feet from [Mosley]; however, a light was placed on [Mosley] and the victim made a positive identification.

Order, 9/24/2015, at 1-2. The trial court denied Mosley's motion and he proceeded to a jury trial.

The trial court summarized the evidence presented at trial as follows:

On December 8, 2014, at approximately 12:00a.m., Reginald Glascoe, "herein Mr. Glascoe" was leaving his

store and walking back to his home in Chester, Delaware County. [N.T., 10/14/2015 p. 28-32]. As Mr. Glascoe was walking down the 100 block of East 23rd Street, he ran into a female that he recognized. [N.T., 10/14/2015 p.28-32]. The female, Ann Marie, was standing in between her yard and a neighbor's yard when she began to strike up a conversation with Mr. Glascoe. [N.T., 10/14/2015 p. 29]. Ann Marie stated that she wanted to go inside the house next to where she was staying in order to see her cousin; the two entered the house. [N.T., 10/14/2015 p. 29]. Once inside, the location was completely dark and Mr. Glascoe started to feel as though something was wrong. [N.T., 10/14/2015 p.29]. Before he had a chance to react, another individual, whom Mr. Glascoe could not see at the time, put a gun to the back of his head and told him to empty his pockets. [N.T., 10/14/2015 p. 29 -30].

Mr. Glascoe emptied his pockets and the individual with the gun took his wallet and the cash in his pocket which Mr. Glascoe estimated to be anywhere between $40-$53 dollars. [N.T., 10/14/2015 p. 30-31]. Unsatisfied with the contents of Mr. Glascoe's pockets, the individual with the gun demanded more to which Mr. Glascoe kept repeating that he did not have anything else on him. [N.T., 10/14/2015 p. 31]. [Mosley] pulled the trigger aiming towards the area of Mr. Glascoe's feet but the gun did not fire. [N.T., 10/14/2015 p.31]. At this point, the individual and Mr. Glascoe were facing each other. [N.T., 10/14/2015 p. 31]. The individual was wearing dark clothing and a hoodie but Mr. Glascoe could clearly see his face. [N.T., 10/14/2015 p. 31-32]. The individual was later identified as Dwight Mosley . . . . [N.T., 10/14/2015 p. 32].

[Mosley] told Mr. Glascoe to walk outside of the house. [N.T., 10/14/2015 p. 33]. Once outside, Mr. Glascoe told [Mosley] that he "was just going to have to do what you have to do because I'm leaving.["] [N.T., 10/14/2015 p. 33]. [Mosley] pulled the trigger on the small black revolver a second time, this time pointing the gun in the area of Mr. Glascoe's chest. The two were approximately five feet away from each other. [N.T., 10/14/2015 p. 33-35]. Mr. Glascoe saw and heard [Mosley] pull the trigger of the firearm a second and third time. He could hear the spark from the gun; however the gun did not go off.

- 4 -

[N.T., 10/14/2015 p. 36]. [Mosley] began fiddling with the firearm so Mr. Glascoe started running down the middle of the street. [N.T., 10/14/2015 p.36].

Officer Ricci Pyle was working patrol for the City of Chester Police Department that evening and was assigned to the 22 area beat, encompassing the 100 block of East 23rd Street. [N.T., 10/14/2015 p. 83]. Around 12:30a.m., Officer Pyle was responding to a 911 emergency call and traveling east on East 23rd Street approaching the 100 block when he observed a male come off the north end of the sidewalk in a full sprint, running east down the middle of the roadway. [N.T., 10/14/2015 p. 84]. As Officer Pyle approached the intersection of East 23rd and Madison Avenue, the male was standing on the corner, looking out of breath. [N.T., 10/14/2015 p. 84]. Officer Pyle rolled down his window and asked the male, who later identified himself as Mr. Glascoe, if he was alright. Mr. Glascoe responded that he had just been robbed. [N.T., 10/14/2015 p. 84]. Officer Pyle pulled his car off to the side and got out in order to speak with Mr. Glascoe. [N.T., 10/1/42015 p. 84].

Mr. Glascoe advised Officer Pyle what had transpired at the residence on the 100 block of East 23rd Street. [N.T., 10/14/2015 p. 37]. Mr. Glascoe informed Officer Pyle the man who robbed him was a black male wearing a black hoody, had a gun, and was located on the 100 block of East 23rd Street. [N.T., 10/14/2015 p. 85, 86]. Officer Pyle took Mr. Glascoe back to the area and Mr. Glascoe pointed out a residence numbered 107 as the exact location where it happened. [N.T., 10/14/2015 p. 38]. Officer Pyle took [Mr. Glascoe] home to his residence on Madison Street. [N.T., 10/14/2015 p. 38]. Mr. Glascoe told Officer Pyle that he would be able to identify who robbed him. [N.T., 10/14/2015 p. 88].

After dropping Mr. Glascoe off, Officer Pyle returned to the area, traveling east on 23rd Street in his patrol vehicle; he could see two people off in the distance in the middle of the street walking west towards his car. [N.T., 10/14/2015 p. 88]. As he got closer to the individuals, Officer Pyle observed the two walk toward the north sidewalk. [N.T., 10/14/2015 p. 88]. When Officer Pyle reached the area where the two were walking, he only

observed one person, a white female. [N.T., 10/14/2015 p. 89]. Officer Pyle drove around the block and stopped on the corner of Crosby Street and East 23rd Street. [N.T., 10/14/2015 p. 89]. After sitting there for approximately five-to-ten seconds, Officer Pyle observed the white female reappear, walking towards his general direction on the south side of East 23rd Street. [N.T., 10/14/2015 p. 89].

Officer Pyle exited his vehicle to ask the female some questions as she was in the area of the robbery. [N.T., 10/14/2015 p. 89]. As he was crossing East 23rd Street, a black male appeared from the east, the area where Officer Pyle originally saw the two individuals walking. [N.T., 10/14/2015 p. 90]. Officer Pyle asked the male, later identified as [Mosley], where he disappeared to from the first time Officer Pyle saw them. [N.T., 10/14/2015 p. 91]. [Mosley] responded that he went into a rear yard to urinate. [N.T., 10/14/205 p. 91]. The woman provided that her name was Ann Marie Borkey. [N.T., 10/14/2015 p. 91]. Ann Marie stated that she lived at 103 East 23rd Street, the residence next to 107. [N.T., 10/14/2015 p. 92]. Officer Pyle asked [Mosley] why he would urinate in someone's yard as opposed to using a bathroom; [Mosley] did not really answer. [N.T., 10/14/2015 p. 93]. At this time, Officer Pyle determined that he was going to place [Mosley] under arrest for public urination and disorderly conduct. [N.T., 10/14/2015 p. 32].

Prior to placing him into custody, Officer Pyle asked [Mosley] if he had anything on his person that Officer Pyle should know about. [N.T., 10/14/2015 p. 93]. [Mosley] advised Officer Pyle that he "found the gun." [N.T., 10/14/2015 p. 93]. Officer Pyle retrieved a small black revolver from [Mosley's] person. [N.T., 10/14/2015 p. 93]. [Mosley] then told Officer Pyle that he had the gun for Ann Marie. [N.T., 10/14/2015 p. 93]. After securing the firearm, Officer Pyle observed three empty chambers and two live rounds still left in the five barrel chamber. [N.T., 10/14/2015 p. 95]. Knowing the description of the male involved in the robbery, the woman being named Ann

Marie,[2] her residence being next to the scene of the robbery, the firearm matching the description and three missing bullets matching Mr. Glascoe's explanation of what happened, and the two individuals walking around the area of the crime, Officer Pyle told [Mosley] that he had reason to believe he was involved in a robbery and that he would have to remain here for possible identification from the victim. [N.T., 10/14/2015 p. 96]. In addition to the being in possession of the firearm, [Mosley] also had $42 dollars of loose cash on him. [N.T., 10/14/2015 p. 98].

Officer Matthew Steward was also on patrol for Chester City Police Department that evening. [N.T., 10/14/2015 p. 75]. Responding to a radio call from Officer Pyle in regards to a robbery, Officer Steward responded to the 100 block of East 23rd Street. [N.T., 10/14/2015 p. 76]. When Officer Steward arrived on scene, Officer Pyle had a subject stopped and had recovered a firearm. [N.T., 10/14/2015 p. 76]. Officer Pyle directed Officer Steward to make contact with Mr. Glascoe and transport him back to the scene for a possible identification. [N.T., 10/14/20I5 p. 76].

Officer Steward made contact with Mr. Glascoe and picked up him at his residence on Madison Street, approximately thirty minutes after Officer Pyle had originally dropped him off. [N.T., 10/14/2015 p. 77, 38]. Mr. Glascoe got in the back of Officer Steward's marked patrol vehicle and the two drove back to Officer Pyle's location. [N.T., 10/14/2015 p. 77]. When they arrived, Officer Steward turned on his spotlight so Mr. Glascoe could see the suspect who was approximately 10-to-12 feet from the patrol vehicle. [N.T., 10/14/2015 p. 78]. Mr. Glascoe made a positive identification, without hesitation in his voice, within a matter of seconds. [N.T., 10/14/2015 p. 78]. According to Mr. Glascoe, even though the entire

_____

[2] Glascoe did not tell Officer Pyle that a female had been involved in the incident. N.T., 4/27/16, at 100. Therefore, at the suppression hearing, Officer Pyle did not testify that Mr. Glascoe had told him about the encounter with this female and, at the time of the stop, he did not know that a female named Ann Marie was involved in the incident.

robbery occurred within a matter of minutes, he stared at [Mosley's] face and the gun pointed at him for what seemed like an eternity. [N.T., 10/14/2015 p. 39-40]. From the time Officer Pyle encountered Mr. Glascoe until the positi[ve] identification, the whole situation was approximately thirty-five minutes. [N.T., 10/14/2015 p. 101]. After pointing out [Mosley] to the officers, Mr. Glascoe went to Chester Police Station to write a statement. [N.T., 10/14/2015 p. 41].

Opinion, 4/27/16, at 1-6 ("1925(a) Op.") (brackets around citations in original). The trial court further noted that detective Louis Grandizio of the Delaware County Criminal Investigative Division was offered and accepted as an expert in firearms, firearm identification, and tool-markings. 1925(a) Op. at 7. Detective Grandizio prepared a report, which was marked as an exhibit. *Id.* Detective Grandizio tested the firearm found on Mosley and found it to be operable. He further tested the two cartridges that were located inside the firearm and identified the cartridges by manufacturer and caliber. Detective Grandizio explained that "with only two cartridges in a five chamber revolver, theoretically the trigger could be pulled three times with no cartridge actually being fired." *Id.*

In addition, the Commonwealth and Mosley stipulated that, if called to testify: (1) Corporal Weigand would testify that he completed a search of Mosley in the jail cell of the Chester Police Department and located four bags of crack cocaine, and that a proper chain of custody has been established as to the narcotics; and (2) a lab technician from the Pennsylvania State Police Lab would testify that the substance tested positive to be cocaine. *Id.*

The jury found Mosley guilty of robbery, aggravated assault, possession of a controlled substance, and possession of drug paraphernalia. The jury found Mosley not guilty of attempted homicide. The jury further found, in response to a fact question, that Mosley possessed a firearm beyond a reasonable doubt. The jury was then asked whether Mosley was guilty of possession of a firearm prohibited and found him guilty.

On December 22, 2015, the trial court sentenced Mosley to an aggregate sentence of 180 to 360 months' incarceration plus 4 years' consecutive probation.[3] On December 30, 2015, Mosley filed a post-sentence motion, arguing that the verdict was against the weight of the evidence, requesting that the trial court reconsider its order denying Mosley's pre-trial motions, and seeking reconsideration of his sentence. On January 13, 2016, the trial court denied this motion.

On February 11, 2016, Mosley filed a timely notice of appeal. That same day, the trial court entered an order directing Mosley to file a Pennsylvania Rule of Appellate Procedure 1925(b) statement. Mosley's

---

[3] The trial court imposed a sentence of 120 to 240 months' incarceration for the robbery conviction; 60 to 120 months' incarceration for the conviction for possession of firearm prohibited, consecutive to the sentence imposed for the robbery conviction; 24 to 48 months' incarceration for the aggravated assault conviction, concurrent to the other sentences; 3 years' consecutive probation for the conviction for possession of a controlled substance; and 1 year consecutive probation for the conviction for possession of drug paraphernalia.

counsel requested an extension of time to file a 1925(b) statement, which the trial court granted. Counsel then filed a petition to appoint counsel[4] and a second request for an extension of time. The trial court appointed new counsel and granted an extension. On April 7, 2016, new counsel filed a Rule 1925(b) statement.

Mosley raises the following issues on appeal:

1. Did the trial court abuse its discretion and/or commit [an] error of law by denying [Mosley's] motion to suppress the weapon and statements made to the officer, where no reasonable suspicion existed for the stop for the crimes with which [Mosley] was ultimately charged, and any statements were coerced as he was subject to custodial interrogation without being advised of the **Miranda**[5] warnings?

2. Did the trial court abuse its discretion and/or commit [an] error of law by denying [Mosley's] request to preclude the witness's out of court identification, where the identification procedures used were overly suggestive and in violation of [Mosley's] due process rights under **U.S. v. Wade**[6] and subsequent holdings, as [Mosley] was taken to the station and presented to the alleged victim alone for the purpose of being identified?

_____

[4] The petition to appoint counsel stated that current counsel had a conflict of interest because "[i]t is believed that an essential Commonwealth witness was represented by the Delaware County Public Defender's Office. This information was recently discovered." Pet. to Appoint Counsel, filed 3/14/16, at ¶ 8.

[5] **Miranda v. Arizona**, 384 U.S. 436 (1966).

[6] 388 U.S. 218 (1967).

3. Did the trial court abuse its discretion and /or commit [an] error of law by invoking the mandatory minimum sentence, as it was unconstitutional under the **Alleyne**[7] decision in that it allowed the imposition of a mandatory minimum sentence based on findings of the sentencing judge by a preponderance of the evidence?

4. Was the verdict against the weight and sufficiency of the evidence where the Commonwealth's witness testimony was wildly inconsistent and incredible, as he was unable to describe the perpetrator's clothing despite telling the investigating officer that "[y]es I got a good look at him," and as it consisted of three different versions of the location where the robbery took place?

5. The verdict was against the weight and sufficiency of the evidence where, unbeknownst to defense counsel, the Commonwealth's material witness had a previous recent conviction for a *crimen falsi* offense (**see** CP-23-CR-0004705-2012), and was not subjected to impeachment for said offense causing actual prejudice to [Mosley].

Mosley's Br. at 4-5.

Mosley first argues that Officer Pyle lacked reasonable suspicion to stop and search Mosley and that the trial court erred when it failed to suppress the weapon found by Officer Pyle as fruit of this unlawful stop and search. Mosley's Br. at 10. Mosley maintains that the vague description provided by Glascoe of a male in a hoodie and jeans failed to provide reasonable suspicion to stop Mosley. *Id.* at 11. Mosley also argues that, even if Officer Pyle had reasonable suspicion to stop him, the trial court should have suppressed his statement that he "found a gun" and the gun itself because the statements were coerced. *Id.* at 13. He claims he was

---

[7] **United States v. Alleyne**, 133 S.Ct. 2151 (2013).

subject to a custodial interrogation, but was not provided his **Miranda** warnings. **Id.**

When reviewing a denial of a suppression motion, we must determine whether the record supports the trial court's factual findings and whether the legal conclusions drawn from those facts are correct. **Commonwealth v. Brown**, 64 A.3d 1101, 1104 (Pa.Super. 2013). We may only consider evidence presented at the suppression hearing. **In re L.J.**, 79 A.3d 1073, 1085-87 (Pa. 2013). In addition, because the Commonwealth prevailed in the suppression court, we consider only the Commonwealth's evidence and so much of the defense evidence "as remains uncontradicted when read in the context of the record as a whole." **Brown**, 64 A.3d at 1104 (quoting **Commonwealth v. Cauley**, 10 A.3d 321, 325 (Pa.Super. 2010)). We may reverse only if the legal conclusions drawn from the facts are in error. **Id.**

The law recognizes three distinct levels of interaction between police officers and citizens: (1) a mere encounter; (2) an investigative detention; and (3) a custodial detention. **See Commonwealth v. Jones**, 874 A.2d 108, 116 (Pa.Super. 2005).

"A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond," **Commonwealth v. DeHart**, 745 A.2d 633, 636 (Pa.Super. 2000) (internal citations and quotations omitted), and

therefore need not be justified by any level of police suspicion. *Commonwealth v. Polo*, 759 A.2d 372, 375 (Pa. 2000).

"In contrast, an investigative detention . . . carries an official compulsion to stop and respond." *DeHart*, 745 A.2d at 636 (internal quotation marks omitted). Because "this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity." *Id.* (internal quotation marks omitted).

Finally, "a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest." *Id.* This level of interaction requires that the police have probable cause to believe that the person detained "has committed or is committing a crime." *Commonwealth v. Goldsborough*, 31 A.3d 299, 306 (Pa.Super. 2011) (quoting *Commonwealth v. Williams*, 2 A.3d 611 (Pa.Super. 2011) (*en banc*)).

Following a hearing, the trial court made the factual findings as stated above, *supra* at 2-3, which are supported by the record. The trial court further stated in its conclusions of law:

> 5. Here, the initial interaction between Officer Pyle and [Mosley] was a mere encounter. [Mosley] was free to leave when Officer Pyle approached him. As such, [Mosley] was not entitled to *Miranda* warnings prior to Officer Pyle speaking with him. [Mosley] volunteered that he was urinating in a public place. At this moment, Officer Pyle was well within his power to cite or arrest [Mosley] for a summary offense and to inquire about weapons, as he was being placed into cuffs.

- 13 -

6. Once Officer Pyle legally obtained the firearm, coupled with the information he had about the robbery that occurred in the exact same area a short time prior, Officer Pyle had reasonable suspicion that criminal activity was afoot. With the victim's positive identification, Officer Pyle also had probable cause to arrest for the robbery in addition to the disorderly conduct.

Order, 9/24/15, at 3. We agree with the trial court.

When Officer Pyle approached the female, who was in the vicinity of a recent robbery, and Mosley appeared, the interaction was a mere encounter, and no level of suspicion was required. Officer Pyle made no verbal commands and did not impede Mosley's movement. *See Commonwealth v. Guess*, 53 A.3d 895, 897-98, 901 (Pa.Super. 2012) (finding initial approach and questioning was mere encounter where officers responded to report of attempted burglary by two black males, one wearing a white t-shirt and one wearing black jacket and where officers approached two males and asked whether they lived there and whether officer could speak with them). After Mosley informed Officer Pyle that he had just urinated in someone's backyard, and Officer Pyle was prepared to issue a citation for disorderly conduct,[8] he could conduct a pat down search prior to placing Mosley into

_____

[8] Officer Pyle testified that he decided to cite Mosley for disorderly conduct. N.T., 9/21/15, at 18. Whether he would issue a citation at the scene or bring the individual to the police station depended on whether he had more citations in his vehicle. *Id.* at 19. However, even if Officer Pyle planned to issue the citation at the scene, he would have conducted a pat-down search for safety and place the individual in the police cruiser while writing the citation. *Id.* at 19-20.

custody.[9] Further, a pat-down search may include attendant questions, such as whether the individual has any weapons on his person. *See Commonwealth v. Kondash*, 808 A.2d 943, 948 (Pa.Super. 2002) (noting that "even during a custodial interrogation, the requirements of *Miranda* will be excused where police have reason to fear for their well-being and ask questions to ensure their safety and not to elicit incriminating responses"); *see also Commonwealth v. Pakacki*, 901 A.2d 983, 988 (Pa. 2006) (concluding that frisk and "moderate number of questions" are not functional equivalent of arrest). Accordingly, the Trial Court properly declined to suppress the gun and Mosely's statements.

Mosley next claims the trial court erred or abused its discretion when it denied his motion to preclude Glascoe's out-of-court identification. Mosley's Br. at 15. He claims the one-on-one identification was unduly suggestive. *Id.* at 16. Mosley further claims the in-court identification was inadmissible

---

[9] Recently, this Court stated in dicta that public urination may not always establish that an individual has committed the summary offense of disorderly conduct. *Commonwealth v. Vetter*, 149 A.3d 71, 76-77 (Pa.Super. 2016). We stated that the Commonwealth had not presented evidence to demonstrate "how, under the specific facts of this case, where [the appellant] appeared to be urinating at the side of a highway, in the dark of night, in a snow storm, away from any residence or businesses, positioning himself such that he was largely protected from view, such action was likely to lead to tumult and disorder." *Id.* at 77. Here, Officer Pyle had probable cause to believe that the crime of disorderly conduct may have been committed because Mosley admitted to urinating in someone's backyard. *See Commonwealth v. Williams*, 568 A.2d 1281, 1288 (Pa.Super. 1990) (finding arrest and search incident to arrest for public urination proper where officer observed appellant urinating on a building).

because there was no independent basis for the identification as Glascoe provided different descriptions of the perpetrator and the identification occurred in the same vicinity as the crime, while Mosley was handcuffed and standing outside a police car.

To determine whether an out-of-court identification should have been suppressed, this Court has stated:

> Suggestiveness in the identification process is but one factor to be considered in determining the admissibility of such evidence and will not warrant exclusion absent other factors. As this Court has explained, the following factors are to be considered in determining the propriety of admitting identification evidence: the opportunity of the witness to view the perpetrator at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the perpetrator, the level of certainty demonstrated at the confrontation, and the time between the crime and confrontation. The corrupting effect of the suggestive identification, if any, must be weighed against these factors. Absent some special element of unfairness, a prompt one on one identification is not so suggestive as to give rise to an irreparable likelihood of misidentification.

*Commonwealth v. Hale*, 85 A.3d 570, 574 (Pa.Super. 2014) (quoting *Commonwealth v. Wade*, 33 A.3d 108, 114 (Pa.Super. 2011)) (internal citations and quotation marks omitted), *aff'd*, 128 A.3d 781 (Pa. 2015).

The trial court found:

> Here, the robbery occurred a short time prior to the identification; the victim told Officer Pyle that he had a clear look at the robber and that he could identify him again. In addition, [Mosley] was not in the police cruiser when the identification took place. Furthermore, pursuant to the preliminary hearing testimony incorporated at the suppression hearing, the victim did not even know if [Mosley] was in cuffs during the identification. This Court

- 16 -

finds there was no evidence to suggest that the identification of [Mosley] by the victim was so impermissibly suggestive as to give risk to an irreparable likelihood of misidentification.

Order, 9/28/15, at 4. This was not an error of law or an abuse of discretion. *See Hale*, 85 A.3d at 575 (out-of-court identification admissible where police brought appellant, who was handcuffed, to victim's home where robbery occurred, reasoning: (1) appellant held a gun in victim's face and forced her to hide her face at various points, but victim observed appellant's face on multiple occasions throughout five-minute robbery, (2) room was not fully illuminated, but victim's television provided sufficient lighting during the robbery, and (3) victim refused to identify another individual as assailant before she recognized appellant); *Commonwealth v. Armstrong*, 74 A.3d 228, 238-39 (Pa.Super. 2013) (out-of-court identification admissible where victim was able to see defendant when she first pulled up window shade and again after she called police, she described individual with "a white hoody on and a coat and a crow bar in his hand," and less than ten minutes later, police drove her to see someone they had picked up running through the apartment complex), *aff'd on other grounds*, 107 A.3d 735 (Pa. 2014).[10]

---

[10] The Pennsylvania Supreme Court granted an appeal in *Armstrong* to address whether 42 Pa.C.S. § 9714(a)(2) requires prior sentencing as a second-strike offender to invoke the third-strike provision. The Supreme Court affirmed as to this issue but stated, "[w]e express no opinion concerning the Superior Court's treatment of any other issue." *Commonwealth v. Armstrong*, 107 A.3d 735, 736 (Pa. 2014).

In his third issue, Mosley argues that the trial court erred when it sentenced him to a mandatory minimum sentence. Mosley's Br. at 17-18. This claim lacks merit.

Mosley's claim that the imposition of a mandatory minimum sentence violated *Alleyne* challenges the legality of his sentence. *Commonwealth v. Barnes*, --- A.3d ----, 2016 WL 7449232, at *5 (Pa. Dec. 28, 2016). Challenges to the legality of a sentence raise questions of law, for which this court's standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Fennell*, 105 A.3d 13, 15 (Pa.Super. 2014).

The trial court sentenced Mosley to a mandatory minimum sentence pursuant to 42 Pa.C.S. § 9714(a)(1), which provides:

> Any person who is convicted in any court of this Commonwealth of a crime of violence shall, if at the time of the commission of the current offense the person had previously been convicted of a crime of violence, be sentenced to a minimum sentence of at least ten years of total confinement, notwithstanding any other provision of this title or other statute to the contrary. Upon a second conviction for a crime of violence, the court shall give the person oral and written notice of the penalties under this section for a third conviction for a crime of violence. Failure to provide such notice shall not render the offender ineligible to be sentenced under paragraph (2).

42 Pa.C.S. § 9714(a)(1).

In *Alleyne*, the United States Supreme Court held that "[a]ny fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." 133 S.Ct. at 2155. However, as noted by this Court, the "Supreme Court has recognized

a narrow exception to this rule for prior convictions." *Commonwealth v. Bragg*, 133 A.3d 328, 333 (Pa.Super. 2016); *accord Alleyne*, 133 S.Ct. at 2160 n.1.  Further, this Court has concluded that section 9714 is not unconstitutional pursuant to *Alleyne*, because it provides for mandatory minimum sentences based on prior convictions.  *Bragg*, 133 A.3d at 333[11]; *Commonwealth v. Reid*, 117 A.3d 777, 785 (Pa.Super. 2015).

Because the imposition of a mandatory minimum sentence was based on a prior conviction, the sentence was constitutional.

In Mosley's fourth issue, he claims that the verdict was against the weight of the evidence and there was insufficient evidence to support the guilty verdict.  He claims the victim did not know Mosley and did not see Mosley's face, as the assailant approached the victim from behind and there was poor lighting.  Mosley's Br. at 20.  The victim stated he did not see Mosley's face for long and testified that the suspect was wearing a "black hoodie, I guess," but did not know what other clothing the suspect was wearing.  *Id.*  Further, although the victim's written statement maintained

---

[11] On August 4, 2016, the Pennsylvania Supreme Court granted a petition for allowance of appeal in *Bragg* to review the following question: "Should the mandatory minimum sentence imposed by the trial court under 42 Pa.C.S.A. § 9714 be vacated, and this matter remanded for a new sentencing hearing, due to the fact that § 9714 is unconstitutional as currently drafted?"  Order, *Commonwealth v. Bragg*, 143 A.3d 890 (Pa. 2016).  As of the date of this memorandum, the Supreme Court has not yet issued an opinion in *Bragg*.

the attack happened outside while he was walking home, at the preliminary hearing and at trial he stated the robbery occurred inside a house. ***Id.***[12]

This Court reviews a weight of the evidence claim for an abuse of discretion. ***Commonwealth v. Clay***, 64 A.3d 1049, 1055 (Pa. 2013). "One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." ***Id.*** (quoting ***Commonwealth v. Widmer*** 744 A.2d 745, 753 (Pa. 2000)). "Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence." ***Id.***

A trial court should not grant a motion for a new trial "because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." ***Clay***, 64 A.3d at 1055. "Rather,

---

[12] Although Mosley purports to challenge both the sufficiency and the weight of the evidence, the argument challenges only the weight of the evidence, as it alleges the victim's testimony was not credible. Further, Mosley fails to indicate what element, if any, the evidence was insufficient to support. Accordingly, to the extent he attempts to raise a sufficiency challenge, that claim is waived. ***See Commonwealth v. Garland***, 63 A.3d 339, 344 (Pa.Super. 2013) (claim not preserved where failed to specify element or elements upon which evidence was insufficient); ***Commonwealth v. Santiago***, 980 A.2d 659, 662 n.3 (Pa.Super. 2009) (claim waived when appellant fails to include argument to support issue).

'the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" ***Id.*** (quoting ***Widmer***, 744 A.2d at 752). Courts have stated that "a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." ***Id.*** (quoting ***Commonwealth v. Brown***, 648 A.2d 1177, 1090 (Pa. 1994)).

The trial court concluded:

> In number 4 and 5 of his 1925(b) Statement, [Mosley] alleges that the verdict was against the weight of the evidence as Mr. Glascoe's testimony was incredible and that defense counsel was unaware of his conviction for a crime of crimen falsi, docketed as 4075-2012. The jury heard Mr. Glascoe's version of the events that transpired. They also heard counsel for [Mosley] cross-examine Mr. Glascoe on any inconsistencies between his testimony and his first statement to police, marked as C-3. Counsel for [Mosley] also pointed out any inconsistencies between [Mr. Glascoe's] testimony and his prior testimony at the preliminary hearing. Counsel went through the testimony line-by-line pointing out what he thought to be inconsistencies between the testimonies. The jury weighed the evidence, listened to Mr. Glascoe explain his answers to counsel's questions, and determined that he was a credible witness. At best, the minor inconsistences elicited by counsel for [Mosley] were not enough to damage Mr. Glascoe's credibility and certainly do not shock one[']s sense of justice. As such, [Mosley's] claim is without merit.

1925(a) Op. at 11. The trial court did not abuse its discretion in finding the verdict did not shock the conscience and in finding the claim meritless.

Mosley's final issue is based on the claim that the Commonwealth violated ***Brady v. Maryland***, 373 U.S. 83 (1963), because it failed to disclose that Glascoe had, in 2012, pled guilty to providing false identification to law enforcement, a crime involving dishonesty or false statement. Mosley's Br. at 21. He claims this deprived him of a meaningful chance to cross-examine Glascoe on the conviction and that he suffered prejudice as a result of the Commonwealth's failure to disclose. ***Id***.[13]

Our Supreme Court has stated:

> Under ***Brady***, "a prosecutor has an obligation to disclose all exculpatory information material to the guilt or punishment of an accused, including evidence of an impeachment nature." ***Commonwealth v. Spotz*** [610 Pa. 17], 18 A.3d 244, 275–76 (Pa.2011) (citation omitted). To establish a ***Brady*** violation, appellant must demonstrate: the evidence at issue was favorable to him, because it was either exculpatory or could have been used for impeachment; the prosecution either willfully or inadvertently suppressed the evidence; and prejudice ensued. ***Id.,*** at 276 (citation omitted). "The evidence at issue must have been 'material evidence that deprived the defendant of a fair trial.' . . . 'Favorable evidence is material . . . if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" ***Id.*** (citations omitted).

***Commonwealth v. Solano***, 129 A.3d 1156, 1170 (Pa. 2015) (quoting

***Commonwealth v. Walker***, 613 Pa. 601, 36 A.3d 1, 9 (2011) (omissions in

_____

[13] Mosley frames this issue as both a sufficiency of the evidence claim and a weight of the evidence claim. His argument, however, raises a ***Brady*** claim.

- 22 -

original)).  An appellant may not establish a **Brady** violation "when the appellant knew, or with reasonable diligence, could have uncovered the evidence in question," **Commonwealth v. Bomar**, 104 A.3d 1179, 1189 (Pa. 2014) (quoting **Commonwealth v. Paddy**, 15 A.3d 431, 451 (Pa. 2011)), or where the parties had equal access to the information, **Commonwealth v. Grant**, 813 A.2d 726, 730 (Pa. 2002).

Following Mosley's sentencing, counsel from the public defender's office[14] filed a motion to withdraw alleging he had a conflict of interest because the public defender's office previously represented a witness in the case.  The sole non-police officer witness at trial was Glascoe.  Therefore, Mosley's counsel had the information the prosecution allegedly withheld, that is, that Glascoe pled guilty to providing false identification in 2012.  Mosley has not established that he could not have uncovered the evidence with reasonable diligence.  **See Grant**, 813 A.2d at 730 (finding appellant failed to establish **Brady** claim where he did not explain why "public defender could not have procured" information about witness's prior conviction and

---

[14]  Mosely was represented by counsel from the public defender's office at trial.  Different counsel from the public defender's office represented Mosley after the filing of the notice of appeal.  The second counsel filed the petition to withdraw.

status as parolee "before or during trial").[15]   Accordingly, Mosley's **Brady**

claim fails.[16]

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary


Date: 1/23/2017

---

[15] It further appears the parties may have had equal access to the information. **See Grant**, 813 A.2d at 730 (noting parties may have had equal access to evidence of witness's past convictions and status as parolee).

[16] Whether Mosley has a viable ineffective assistance of counsel claim, which he could raise in a PCRA petition, is a question for another day. **See Grant**, 813 A.3d at 730.